SERVICE ENGINEERING COMPANY, a corporation; The Jonathan Corporation, a Virginia corporation; and Triple A Machine Shop, Inc., a California corporation, Plaintiffs,

v.

SOUTHWEST MARINE, INC., a California corporation; Southwest Marine of San Francisco, Inc., a California corporation; Arthur E. Engel and Herbert Engel, individuals; and Does One through Twenty, Inclusive, Defendants.

No. C–86–6096 SAW.

United States District Court, N.D. California.

Aug. 8, 1989.

Khourie, Crew & Jaeger, Eugene Crew and William L. Jaeger, San Francisco, Cal., for plaintiffs.

M. Laurence Popofsky and Monika Lee, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

WEIGEL, District Judge.

Plaintiffs, ship repair contractors, allege that defendants falsely certified to the United States Navy and Small Business Administration (SBA) that they were a small business, allowing them to obtain "small business set aside" contracts from the Navy that otherwise would have gone to plaintiffs.

Plaintiffs assert claims for violations of the Sherman Act, 15 U.S.C. § 2, the Racketeering Influenced and Corrupt Practices Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, the California Business and Professions Code, § 16720, and also allege fraud, unfair business practices, interference with prospective business relations, malicious prosecution and abuse of process.

The parties bring cross-motions for summary judgment.

### I. Background.

This litigation presents three major issues: (1) Did the defendants act fraudulently by certifying themselves as "small" to SBA and the Navy; (2) If so, which, if any of the plaintiffs, was damaged; (3) What is the amount of any damages. The following facts are not in dispute.

From 1976 until 1983, plaintiffs and defendants competed for contracts to repair Navy vessels. The set-aside contracts they sought were designated for "small businesses" pursuant to the Small Business Act of 1958, 15 U.S.C. § 631 *et seq.* The definition of "small business" is set forth in regulations of SBA. For the category of contracts involved in this lawsuit, a business is "small" if it has fewer than 1000 employees.

Prior to 1976, SBA regulations allowed a business to calculate total employees under a "quarterly method", based on the number of persons employed during the pay period ending nearest the last day of each of the past four calendar quarters. If the average of the four most recent quarterly tallies of employees exceeded 1000, the employer was not considered a small business.

SBA became aware that businesses were understating their true size under the quarterly method by firing employees immediately before the last pay period of the quarter and rehiring them shortly thereafter. 40 Fed.Reg. 55868 (Dec. 2, 1975). To eliminate this practice, SBA in March, 1976, amended its regulations for size determinations by introducing a "pay period method" of counting employees. Under this method, an employer's "number of employees" for purposes of determining small business status is defined as the average of the number of employees during each and every pay period of the preceding year. 13 C.F.R. § 121.2(b) (1988), formerly at 13 C.F.R. § 121.3–2(t). Amending the regulations, SBA declared

> "There should be no flexibility in the computation of a concern's number of employees. We do not consider it desirable for concerns to be able to adjust their employment practices to produce a 'number of employees' figure that does not accurately reflect their normal size in terms of employment."

41 Fed.Reg. 9297 (March 4, 1976).

A separate regulation, however, conferred "small" status on businesses in accordance with "Schedule B" to that provision. For the category "Shipbuilding and repairing," Schedule B set the maximum as 1000 employees. Footnote 1 to Schedule B, which was adopted prior to 1976 regulation amendments and inadvertently left in place thereafter, defined "number of employees" using the old quarterly method. Thus, there was some ambiguity in SBA regulations regarding the proper method of calculating business size.

In May, 1981, defendants used the pay period method to calculate its employee totals. In October, 1981, defendants sought the advice of their attorney, Peter Jones, regarding the appropriate method for calculating size. In his letter, Jones reviewed both the pay period and quarterly methods, but advised that defendants use the quarterly method as provided in footnote 1 to Schedule B. Jones also advised that if defendants were required to submit a SBA Form 355 (Application for Small Business Size Determination), they should be aware that the form defines "number of employees" according to the pay period method.[1] Thus, he advised, "[t]o ensure candor and avoid misunderstanding, you should annotate any such form that [you]

---

1. The Instructions for calculating "Applicants number of employees" on SBA Form 355 define "number of employees" according to the pay period method. No mention is made of the quarterly method.

may execute to indicate that number of employees is 'calculated per Schedule B, Note 1.'" Letter of October 14, 1981.

Defendants in February, 1982, followed their attorney's advice when SBA, in response to a protest, requested that they file a Form 355. Defendants submitted the form to SBA with a cover letter stating "[i]n calculating the number of employees on the enclosed Form 355, we have used the Schedule B method ..." Letter of February 18, 1982. On March 31, 1982, the SBA regional administrator issued a "size determination" which upheld defendants' status as a small business under the quarterly method.

Between February, 1982, and September, 1983, it is undisputed that defendants periodically fired and then rehired employees to stay below an average of 1000 employees using the quarterly method. In one such instance, defendants fired 513 employees during the last week of 1982, then rehired 559 employees one week later. Defendants concede that "the sole purpose of quarter end layoffs was to maintain small business status." Defendants' Memorandum in Support of Summary Judgment at 3, n. 4. Defendants never informed SBA of this practice.

In September, 1983, defendants' status as a small business was challenged by plaintiff Triple A. In its letter dated September 29, 1983, SBA attached Triple A's letter of protest, which alleged that defendants, using the quarterly method, manipulated its number of employees by firing and rehiring them. SBA required that defendants complete Form 355, adding "[a]ttach any additional evidence you might wish to submit to support your position as a small business." In response, defendants submitted the form on October 4, 1989, stating "[w]e believe that the Form 355 information adequately resolves Triple A's allegations." Defendants did not disclose that their calculation of size was based on the quarterly method, nor did they disclose that they had fired and rehired employees to maintain their "small" status.

There is no ambiguity in Form 355. Under "Applicants number of employees"

there is a referral, "See 'Instructions' for definition of the term 'number of employees.'" The Instructions define that term using the pay period method. The form on its face also provides

"Section 16(a) of the Small Business Act, as amended, makes it a criminal offense punishable by fine of not more than $5000 and imprisonment for not more than two years, or both, to make a willfully false statement or misrepresentation to the Small Business Administration for the purpose of influencing in any way the action of the Administration."

The form provides in the Certification section, immediately above the signature line, that

"I hereby certify that all information contained above and in exhibits and attachments hereto are true and complete to the best knowledge and belief of the applicant ..."

On October 5, 1989, in response to a call from SBA's local counsel, defendants mailed an additional letter to SBA certifying that the "total employee" information on Form 355 includes all employees "as defined in the Small Business Size Standards of the SBA Rules and Regulations (13CFR Part 121)." Again, defendants failed to disclose (1) that they calculated size using the quarterly method rather than the pay period method specified in Form 355, and (2) that they periodically fired and then rehired employees. Finally, on October 24, 1983, SBA wrote defendants requiring that they complete a prepared Declaration specifying number of employees to be calculated using the pay period method. By letter dated November 7, 1983, defendants declined to execute the Declaration, stating they could not complete it because they calculated number of employees using the quarterly method.

On December 6, 1983, SBA's regional administrator reversed her March, 1982, determination and found that defendants were not a small business. SBA decertified defendants from obtaining further set-aside contracts.

Meanwhile, in May, 1983, the Navy had sought bids from small businesses for a

contract for repair and modernization of four vessels on the West Coast (the "AOR contract"). This contract was the largest West Coast procurement by the Navy at the time, scheduled to be performed over five years at an estimated cost of approximately $135–150 million.

Plaintiffs and defendants submitted bids on the contract, certifying under penalty of perjury that they were small businesses. On October 12, 1983—while SBA was investigating defendants' small business status—the Navy requested that defendants submit a Second Best and Final Offer as part of the process of evaluating defendants' bid on the AOR contract. On November 2, 1983, the Navy awarded the contract to defendants.

## II. Collateral Estoppel.

■ Three courts and an agency already have considered aspects of this ongoing controversy. This Court will not revisit issues that have been decided by the courts. *See Hernandez v. City of Los Angeles,* 624 F.2d 935, 937 (9th Cir.1980) (collateral estoppel bars party from relitigating issues actually and necessarily decided in prior proceeding); *Lockwood v. Superior Court,* 160 Cal.App.3d 667, 671, 206 Cal.Rptr. 785 (1984) (collateral estoppel obviates the need to relitigate issues already decided in the first action).

On December 12, 1983, defendants appealed the SBA regional administrator's December 6th size determination to SBA's Office of Hearings and Appeals.[2] In February, 1984, the Office of Hearings and Appeals upheld the regional administrator's decision decertifying defendants as a small business. This decision was appealed to the United States District Court for the District of Columbia. The district court in December, 1984, affirmed the agency decision. Both SBA and the district court found that defendants' use of the quarterly method was a violation of federal regulations. The district court ruled that the

notice and publication procedures followed with respect to the adoption of the 1976 amendments provided constructive notice that the quarterly method of counting employees was no longer acceptable. Further, the court ruled that defendants' reliance on the March, 1982, decision of the SBA regional administrator, allowing the quarterly method, was unreasonable since that decision directly contradicted not only the regulations but also SBA Form 355. As to the equities, the court stated that the argument is weak indeed for protecting a size determination method highly susceptible to manipulation.

Finally, in September, 1987, the California Court of Appeal for the Fourth Appellate District decided an aspect of this controversy. Defendants here had filed suit claiming that their use of the quarterly method was a trade secret, kept confidential so that competitors would not become aware it was still permitted and to ensure that continued reliance on the method would not be jeopardized. The court of appeal held there was no trade secret, stating that the only "secret" was the way defendants manipulated the quarterly method of reporting so they could "cheat" and qualify as a small business when they were not.

Plaintiffs argue the decisions in these prior cases establish defendants' fraud. The Court disagrees. The prior decisions held that defendants' use of the quarterly method was a violation of federal regulations and their reliance on the March, 1982, SBA regional administrator's decision was unreasonable. The California court of appeals held simply that there was no trade secret.

There were *obiter dicta* statements in the cases to the effect that defendants "cheated" or improperly engaged in manipulation, deception or mischief. The doctrine of collateral estoppel applies only to

---

**2.** Concerned that the Navy would proceed to award a contract while the appeal was pending, defendants also filed suit in the United States Claims Court on December 16, 1983, seeking an order directing the Navy to consider defendants' bid proposal without regard to the SBA regional administrator's size determination. The claims court denied defendants application for a temporary restraining order, and by order of January 16, 1984, upheld the Navy's decision to award the contract to a competitor without awaiting a decision on defendants' appeal.

issues "actually and necessarily determined by a court of competent jurisdiction." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Hernandez,* 624 F.2d at 937. Neither the courts nor SBA had before them the issue of fraud raised here, nor was a finding of fraud by defendants necessary to the prior decisions.

### III. Fraud.

■ The issue of fraud is now before the Court on the parties' cross-motions for summary judgment. Six of the eight claims asserted by plaintiffs are predicated on a finding of defendants' fraud. *See Service Engineering Co. v. Southwest Marine, Inc.,* 661 F.Supp. 48, 50–51 (N.D.Cal. 1987). The Court finds as a matter of law that defendants did commit mail fraud and acted with fraudulent intent during the relevant period.

In its Order of May 21, 1987, this Court denied the parties previous cross-motions for summary judgment. *Service Engineering,* 661 F.Supp. at 48. The Court observed that summary judgment is disfavored in heavily factual settings. *Id.* at 50–51. The Court also found that disputed issues of fact remained concerning (1) whether "defendants knew all along their use of the 'quarterly method' in reliance upon footnote 1 to Schedule B was farfetched and unlikely to be condoned by the SBA", (2) whether defendants' purpose in firing and rehiring employees was to manipulate the "quarterly method" of size determination, (3) whether defendants intended to deceive the government by firing employees before the end of certain quarters, and (4) how often fired employees were rehired immediately following the beginning of the following quarter.

The evidence now clearly establishes that defendants manipulated the quarterly method of counting employees between February, 1982 and December, 1983, by periodically firing and rehiring employees for the purpose of retaining their small business status. Defendants did not disclose their manipulative practices to SBA. During this period, defendants certified in bids to the Navy that they were a small business, and were awarded the AOR contract.

As to the issues listed in (1) and (3) above, both of which bear on whether defendants acted with fraudulent intent, the following undisputed evidence establishes that intent. First, the Court rules, by reason of collateral estoppel, that defendants' reliance on the March, 1982, decision of the SBA regional administrator approving use of the quarterly method was unreasonable. *Southwest Marine v. James C. Sanders,* No. 84–0569, at 8–9 (D.C.D.C.Dec.1984). Given this unreasonable reliance and defendants' non-disclosure of its manipulative practice of firing and rehiring employees, defendants' conduct throughout the relevant period was highly suspect.

Second, the Court finds that defendants' made a false statement on the Form 355 submitted to SBA on October 4, 1983. In the face of a protest as to their size, defendants submitted the signed form, but did not indicate that the "number of employees" was calculated using the quarterly method rather than the pay period method specified on the form. They ignored prior advice of their counsel which, in February, 1982, had led them to submit the form with a letter indicating that the quarterly method had been used. Defendants' false statement on the Form 355, whether characterized as a lie or a material omission, is a basis for finding mail fraud. *United States v. Barnette,* 800 F.2d 1558, 1564–66 & n. 9 (11th Cir.1986), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987) (evidence supported jury verdict that the Form 355's submitted to SBA constituted mail fraud because the forms were not reflective of defendant's true size).

■ Defendants, citing deposition testimony, claim SBA knew they used the quarterly method and thus there was no need to specify that this method was used in completing Form 355. This excuse cannot absolve defendants of their legal obligation to truthfully complete that form. *See* SBA Form 355 and 15 U.S.C. § 645(a). Defendants had a duty to be familiar with and follow the express instructions on the form. *See Heckler v. Community Health Servic-*

**1506**

*es,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). As the Supreme Court stated quoting Justice Holmes

> "Justice Holmes wrote: 'Men must turn square corners when they deal with the Government.' *Rock Island A. & L.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920) This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law.... This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."

*Id.* at 63, 104 S.Ct. at 2225.

Third, when confronted with specific charges of manipulation, defendants' letter and Form 355 sent on October 4, 1983, as well as their letter dated October 5, 1983, failed to disclose to SBA that they had fired and rehired employees under the quarterly method to support their claim of small business status. It was not until November 7, 1983, *after* defendants had been awarded the AOR contract on November 2nd, that defendants responded to SBA's letter of October 24th, which demanded that they complete a declaration using the pay period method to determine their size. Defendants thus failed to disclose critical information until after they were awarded the AOR contract.

"Scienter is a 'mental state embracing intent to deceive, manipulate or defraud.'" *Securities and Exchange Commission v. Burns,* 816 F.2d 471, 474 (9th Cir.1987) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). "Proof of scienter is often based on inferences from circumstantial evidence." *Id.* (citing *Shad v. Dean Witter Reynolds,* 799 F.2d 525, 530 (9th Cir.1986); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). Moreover, mail or wire fraud may be proved by showing that the mails or interstate wires were used to further a "scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension' and this intention is shown by examining the scheme itself." *Sun Savings and Loan Assoc. v. Dierdorff,* 825 F.2d 187, 195–96 (9th Cir. 1987) (quoting *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir.1984), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985)).

The foregoing undisputed facts demonstrate as a matter of law that defendants conduct in the Fall of 1983 was carried out with intent to deceive, manipulate and defraud SBA and the Navy. Defendants conduct constituted mail fraud under federal law. 18 U.S.C. § 1341. Moreover, the facts demonstrate defendants' fraudulent intent, a necessary element of fraud under California law. Cal.Civ.Code § 1572, 1710; *see Stevens v. Superior Court,* 180 Cal. App.3d 605, 608–09 & n. 1, 225 Cal.Rptr. 624 (1986) (scheme was actual fraud because it was both a suppression of material facts and an act fitted to deceive); *Welch v. California,* 139 Cal.App.3d 546, 556, 188 Cal.Rptr. 726 (1983) (suppression of a fact by one who gives information which is likely to mislead for want of communication of that fact is actionable fraud).

■ Defendants claim their communications with SBA are protected by the Noerr–Pennington doctrine, under which efforts to influence public agencies and officials generally are protected by the First Amendment and cannot be the basis for liability under antitrust laws. This privilege does not apply to the furnishing of false information to an agency or adjudicatory body—the First Amendment has not been interpreted to preclude liability for false statements. *Clipper Exxpress v. Rocky Mountain Motor Tariff,* 690 F.2d 1240, 1261 (9th Cir.1982); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("there is no constitutional value in false statements of fact.").

■ Nor are defendants' communications privileged under state law. *See* Cal. Civ.Code § 47(2). Section 47(2) is inapplicable to this case. It applies to challenged

defamatory publications made in the furtherance of judicial, legislative or other official proceedings and to promote the interests of justice. *Barbary Coast Furniture Co. v. Sjolie*, 167 Cal.App.3d 319, 333–35, 213 Cal.Rptr. 168 (1985). It does not apply to SBA Form 355 and the misleading letters and proposal defendants mailed in October, 1983, as part of their efforts to deceive SBA and the Navy. These communications were not made in the interests of justice, but rather were intended to mislead as to defendants' true size. Defendants had an affirmative duty to be truthful in their disclosures to SBA: the face of Form 355 refers to section 16(a) of the Small Business Act, indicating it is a criminal offense to make a willfully false statement or misrepresentation to SBA. Defendants' deceptive communications under such circumstances are not privileged. *See Frisk v. Merrihew*, 42 Cal.App.3d 319, 326, 116 Cal.Rptr. 781 (1974) (publication must have a reasonable relation to the official proceeding, be permitted by law, and the privilege is lost if the privileged occasion is abused).

■ Finally, defendants assert the "government contractor" defense, citing *Boyle v. United Technologies Corp.*, —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). *Boyle* held there could be no tort liability for the manufacturer of a military helicopter for a design defect if the government had approved the precise design specifications; the equipment conformed to those specifications; and the supplier had warned the government about dangers in the use of the equipment known to the supplier. *Id.* 108 S.Ct. at 2518. The Court reasoned that allowing tort liability for the government, or the manufacturer, would frustrate the policy of protecting the government's "discretionary functions." *Id.*

Defendants argue that a series of discretionary decisions by the Navy in awarding the AOR contract to defendants immunized their fraudulent conduct. The Court disagrees. The government contractor defense does not apply to immunize fraudulent conduct. *See e.g., id.* (government

contractor defense requires full disclosure and warnings of risks of use of the equipment); *McGonigal v. Gearhart Industries, Inc.*, 851 F.2d 774 (5th Cir.1988) (government contractor immunity does not apply when the contractor mis-manufactures military equipment). But for defendants' fraudulent certification that they were a small business, the Navy would not have had any "discretion" to award the AOR contract to them. *See* 15 U.S.C. § 637(b)(6) (1982); *Choctaw Manufacturing Co., Inc. v. United States*, 761 F.2d 609, 611 (11th Cir.1985) (SBA has sole responsibility to determine what constitutes a "small business" eligible to bid on set-aside contracts and its determination is binding on all officers of the government having procurement responsibilities).

### IV. Count I—Sherman Act Claim.

■ Defendants challenge plaintiffs' Sherman Act claim arguing that the nature of the market involved makes it impossible for plaintiffs to prove the necessary elements of their claim. Defendants first contend that plaintiffs improperly define the market by reference to the regulations limiting participants to small businesses. However, the "impact of regulation must be assessed simply as another fact of market life." *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 935–36 (9th Cir.1975); *Southern Pacific Communications Co. v. American Telephone and Telegraph Co.*, 556 F.Supp. 825, 874 (D.C.D.C.1983); *Compact v. Metro. Gov't of Nashville v. Davidson County, Tn.*, 594 F.Supp. 1567, 1571–72 (M.D.Tenn.1984) (held as a matter of law that relevant submarket was SBA set-aside contracts for minority owned firms offering architectural services).

Second, defendants argue that obtaining monoply power in the market would be impossible because there was only one buyer, the Navy. This argument must fail. The Ninth Circuit has held that

"[t]he fact the Government is the sole domestic purchaser and regulates [military aircraft] sales does not mean that no market exists which a competitor can

attempt to monopolize. A manufacterer can attempt to monopolize a market by eliminating competition through predatory actions regardless of the product's sophistication and the limited number of its potential customers."

*Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1055 (9th Cir.1983).

The Court in its May 27, 1987 Order determined that factual issues remain concerning the relevant market as defined by plaintiffs. The Court's determination in this regard remains unchanged.

### V. Count II—RICO Claim.

■ Defendants move for summary judgment in their favor as to plaintiffs' RICO claim. In support, defendants cite *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), in which the Supreme Court explained the meaning of "a pattern of racketeering activity", a necessary element under RICO. 18 U.S.C. §§ 1961, 1962. The Court agrees with defendants that the RICO claim must be dismissed. As a matter of law, plaintiffs are unable to establish the "pattern" requirement under RICO, as that requirement has now been interpreted by the Supreme Court.

Plaintiffs' complaint alleges that defendants repeated acts of mail and wire fraud "constitute a pattern of racketeering activity" in violation of certain provisions of RICO. The Supreme Court in *H.J. Inc.* ruled that the term "pattern", as used in RICO, requires (1) the showing of a relationship between two predicate acts, and (2) the threat of continuing unlawful activity. *H.J. Inc.*, —— U.S. at ——, 109 S.Ct. at 2899–2901; *see* 18 U.S.C. § 1961(5). Thus, "[i]t is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (quoting S.Rep. No. 91–617, at 158). "To establish a RICO pattern it must be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.*, —— U.S. at ——, 109 S.Ct. at 2901.

■ The Supreme Court explained that "continuity" is both a closed- and open-ended concept, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with the threat of repetition." *Id.* at ——, 109 S.Ct. at 2902. A party may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Id.*

> "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with longterm criminal conduct."

*Id.* However, when a RICO action is brought *before* continuity can be established in this way, then "liability depends on whether the *threat* of continuity is demonstrated." *Id.* (no emphasis added). For example, the threat of continuity may be established by showing that the predicate acts are a regular way of conducting defendants' ongoing business. *Id.*

Here, defendants' fraudulent conduct extended only "over a few weeks or months" in the Fall of 1983. *Id.* There was no threat of continuity to defendants' fraudulent conduct because it occurred in the context of an SBA size determination which, by its nature, was designed to resolve the controversy surrounding defendants' use of the quarterly method and misstatement of number of employees. Submission of the false Form 355 on October 4, 1983, and the few misleading letters and proposal, did not amount to or pose a threat of continuing racketeering activity.

### VI. Causation.

■ Plaintiffs move for partial summary judgment that plaintiff Service Engineering would have won the AOR contract. Plaintiffs' motion in this regard must be denied.

Although plaintiffs have submitted some persuasive evidence, the Court cannot say as a matter of law that plaintiff Service Engineering would have been awarded the AOR contract but for defendants' fraudulent conduct. The facts indicate that Service Engineering was ranked as the second lowest bidder, behind defendants, in a report reviewing "probable cost" to the

government. The facts are not conclusive, however, that probable cost alone would have been the deciding factor leading the Navy to award the contract to Service Engineering. This question must be reserved for the jury, given (1) the government's discretion in contracting decisions, and (2) the other factors in addition to the amount of a bid which may be considered in determining the suitability of a particular bidder for a contract. *Iconco v. Jensen Construction Co.,* 622 F.2d 1291, 1300 (8th Cir.1980) (court upheld jury verdict that a particular unsuccessful bidder would have been awarded a government contract). In *Iconco,* the court stated the "logical approach, in our view, is to put the unsuccessful bidder to its proof; if [the unsuccessful bidder] proves by a preponderance of the evidence that it would have received the contract award absent the successful bidder's wrongdoing, we find no persuasive reasons why recovery should be denied." *Id.* at 1300.

### VII. Damages.

Defendants move for partial summary judgment on the issue of damages, contending that (1) damages based upon lost profits are too speculative, and (2) damages based upon unjust enrichment must be precluded because plaintiffs' can demonstrate no pre-existing right to the AOR contract.

█ Plaintiffs have shown more than mere speculation that one of them would have received the AOR contract. This Court follows the reasoning of *Iconco* that plaintiffs should be allowed to prove that one of them would have received the AOR contract absent defendants' fraudulent conduct. 622 F.2d at 1299–1302. Furthermore, the measurement of damages as to any plaintiff is no more speculative than similar calculations employed in other antitrust cases. *See e.g., Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,* 773 F.2d 1506, 1511–12 (9th Cir.1985). As to the footnote in *Savini Construction Co. v. Crooks Brothers Construction Co.,* 540 F.2d 1355, 1359 n. 9 (9th Cir.1974), upon

which defendants rely, that dicta must be limited to the facts in that case.[3]

Defendants cite *John C. Holland Enterprises, Inc. v. J.P. Mascaro & Sons, Inc.,* 653 F.Supp. 1242, 1246–47 (E.D.Va.1987), in support of their contention that plaintiffs cannot obtain damages based upon unjust enrichment. The *Holland* court, observing that no party has a *right* to a government contract prior to its award, held that "[w]ithout such a pre-existing right, no cause of action for unjust enrichment may be brought against a third party in Virginia." *Id.* at 1246.

█ The *Holland* decision was grounded on that court's interpretation of Virginia law. This Court must found its decision on California law. The Court believes that California would not allow plaintiffs to state a claim for unjust enrichment (requiring the imposition of a constructive trust) in the context of this case.

The relevant statute is California Civil Code Section 2224 provides

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust or wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained for the benefit of the person who would otherwise have had it."

California courts have held that "[i]n order to create a constructive or involuntary trust as defined in section 2224, no other than the three conditions stated in that section are necessary: the existence of a res (property or some interest in property), the plaintiff's right to that res, and the defendant's gain of the res by fraud, accident, mistake, undue influence or other wrongful act." *Santa Clarita Water Co. v. Lyons,* 161 Cal.App.3d 450, 461, 207 Cal. Rptr. 698 (1984); *United States v. Pegg,* 782 F.2d 1498, 1500 (9th Cir.1986). Thus, "it has been pointed out that 'a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.'" *David Welch Co. v.*

**3.** *Savini* decided simply that "on the facts in this case, a private civil cause of action for lost

profits cannot properly be inferred from the provisions of the [SBA]." 540 F.2d at 1359.

*Erskine & Tulley,* 203 Cal.App.3d 884, 894, 250 Cal.Rptr. 339 (1988).

Plaintiffs meet the first and last requirements above; the second, however, is not met. "Because a constructive trust is a specific remedy, the plaintiff must have some interest that can be returned to it." *Pegg,* 782 F.2d at 1500 (citing *Mandeville v. Solomon,* 33 Cal. 38, 44 (1867)). Here, plaintiffs can show no entitlement to the AOR contract which may have been awarded to them but for defendants fraudulent conduct. The Request for Proposals for the AOR contract specified that the Navy had the right in its discretion to reject any and all proposals. Thus, plaintiffs as a matter of law cannot establish that they had a "right" to that contract. Therefore, their claim in Count VI for damages based upon unjust enrichment must be dismissed.

Having considered carefully the arguments of counsel and being fully advised, the Court HEREBY ORDERS that:

(1) partial summary judgment is entered in plaintiffs' favor as follows: that defendants' committed mail fraud under federal law and acted with fraudulent intent under California law.

(2) plaintiff Service Engineering's motion for partial summary judgment that it would have received the AOR contract is denied.

(3) defendants' cross-motion for summary judgment as to fraud is denied.

(4) defendants' cross-motion for summary judgment as to plaintiffs' Sherman Act claim in Count I is denied.

(5) defendants' cross-motion for summary judgment as to plaintiffs' RICO claim in Count II is granted and Count II is dismissed.

(6) defendants' cross-motion for summary judgment as to the issue of damages for lost profits is denied.

(7) defendants' cross-motion for summary judgment as to the issue of damages based upon unjustenrichment is granted.